RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0111p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JACOB CLARK and GENETTA CLARK, individually and as next friends and guardians of H.C., a minor,

                       *Plaintiffs-Appellants*,

    *v.*

BERNADETTE STONE, CATHERINE CAMPBELL, and DOUGLAS HAZELWOOD, in their individual and official capacities; ERIC FRIEDLANDER and MARCUS HAYCRAFT, in their official capacities only,

                       *Defendants-Appellees*.

> No. 20-5928

───────────────

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:19-cv-00166—Joseph H. McKinley, Jr., District Judge.

Argued:  April 27, 2021

Decided and Filed:  May 19, 2021

Before:  SUHRHEINRICH, GRIFFIN, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Christopher Wiest, CHRIS WIEST ATTORNEY AT LAW, PLLC, Crestview Hills, Kentucky, for Appellants.  David Brent Irvin, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellees.  **ON BRIEF:**  Christopher Wiest, CHRIS WIEST ATTORNEY AT LAW, PLLC, Crestview Hills, Kentucky, Robert A. Winter, Jr., Fort Mitchell, Kentucky, Thomas A. Bruns, BRUNS, CONNELL, VOLLMAR & ARMSTRONG, LLC, Cincinnati, Ohio, for Appellants.  David Brent Irvin, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellees.

_____

**OPINION**

_____

SUHRHEINRICH, Circuit Judge.

## I.  INTRODUCTION

Jacob and Genetta Clark are fundamentalist Christians who sincerely believe that their religion requires them to use corporal punishment when necessary upon their children.  When one of their children came to school with marks on his arms from being hit with a belt, the Kentucky Cabinet for Health and Family Services ("CHFS") became involved.  Pursuant to guidance from a Kentucky regulation, the social workers launched and maintained for several months an investigation for child abuse.  This underlying abuse investigation formed the factual predicate for the legal claims now before this court.

Here, the Clarks claim that the Substantive Due Process Clause of the Fourteenth Amendment gives them a fundamental right to use corporal punishment that may leave marks on their children, and a concomitant right not to be investigated for having done so.  They therefore contend that the aforementioned Kentucky regulation is facially unconstitutional.  They further argue that by the conducting the investigation, the defendants interfered with this right.  The defendants (all employees of CHFS) argue that if there is a such a right, it was certainly not clearly established at the time of the events at issue here and they are therefore entitled to qualified immunity.

The Clarks also take issue with how the investigation was conducted.  They allege that a court order requiring them to cooperate with the investigation and permit home visits violated their Fourth Amendment rights.  They further claim that their First Amendment rights were violated when they were allegedly retaliated against for insisting on filming the home visits.  Finally, the Clarks allege that the investigation violated their Free Exercise rights because it interfered with their ability to use corporal punishment.

For the reasons that follow, we AFFIRM the district court's dismissal of all claims.

## II. BACKGROUND

Genetta and Jacob Clark have three children: C.C., age 16, N.C., age 14, and H.C., age 12. Genetta and Jacob are devout Christians, who believe that their faith compels the use of corporal punishment on their children when it is needed.

On December 16, 2018 Genetta was assisting her son N.C. with dealing with his acne. N.C. became aggravated and slammed the door in his mother's face. Genetta claims that she believed he was going to strike her and that only physical punishment would get his attention, so she struck him twice on the rear end with a wooden back scratcher. When the situation did not de-escalate, Jacob became involved and struck N.C.'s rear end five or six times with his belt. In attempt to stop his father, N.C. stuck his arm up, and Jacob hit his arm with the belt.

C.C. then tried to intervene, at which point Jacob also disciplined him with the belt. The next day C.C. reported to a school counselor that he was being abused at home. The counselor, who is legally obligated to report instances of suspected abuse to the authorities, called the Kentucky Cabinet for Health and Family Services.

Kentucky law requires CHFS to initiate a prompt investigation and take necessary protective action when it receives a report of an abused child. Ky. Rev. Stat. § 620.050(4). Defendant Douglas Hazelwood, supervisor of CHFS's Grayson County office, assigned Defendant Bernadette Stone to the case.

Stone interviewed H.C. and N.C. at their school on December 17, 2018. During this interview Stone saw light red marks left on N.C.'s arm from the belt and took photographs of his arm on her cell phone. She interviewed C.C. the next day at his school. All of the children confirmed that their parents used corporal punishment on them when necessary, but also stated that they were not abused and felt safe at home. When she called Jacob to discuss the matter, he told Stone he would not bring the children in to CHFS for further interviews without a court order.

Stone brought the matter to Assistant County Attorney Sidney Durham, who assists and represents CHFS in juvenile court matters. Based on the photos Stone had taken of N.C.'s arm,

Durham told her that this was sufficient evidence of abuse for her to file juvenile court petitions for each child. The petitions went before Judge Embry of the District Court of Grayson County, Kentucky on December 19, 2018. The Clarks allege that they were not informed of the hearing until less than an hour before it was set to begin, so they were not able to be there.

At this hearing, Judge Embry, relying at least in part on Stone's report (including the photographs) and testimony, issued an order that stated: "no physical discipline, parents to cooperate w/ CHFS" ("no discipline order").[1] Judge Embry made no findings of abuse, and instructed the Clarks to appear in court again on January 9, 2019. At that January 9 hearing, which was before Judge Goff (another Grayson County District Court judge), the court ordered the Clarks, who were in attendance, to "cooperate" with CHFS and to allow CHFS into their home. Judge Goff told Jacob that he did not have a Fourth Amendment right to stop the visits, and that if he failed to cooperate with CHFS, the children could be removed from his and Genetta's custody.

On January 28, 2019, Stone, Defendant Catherine Campbell (another social worker at CHFS), and an accompanying police officer arrived at the Clark's residence to perform a home visit. Jacob had taped a copy of the text of the Fourth Amendment to the front door. Jacob stated that Stone had perjured herself at the hearing and insisted on videotaping the entire interaction between himself and Stone and Campbell, which Stone and Campbell stated they did not consent to. Stone and Campbell told Jacob that if he did not allow them to enter their then they would call the county attorney to see how to proceed, at which point Jacob allegedly relented and allowed them to enter the home.

Stone and Campbell interviewed the family members, and during these interviews Genetta admitted to having struck C.C. with a wooden backscratcher (though denied that she had hit him in the crotch), and Jacob admitted striking N.C. and C.C. with a belt. Though Jacob stated that the hearing before Judge Goff was "a joke", Genetta agreed to follow all court orders and to cooperate with CHFS.

---

[1]Judge Embry stated in her affidavit that "Stone's imprecise use of the words 'laceration' or 'abrasion' in describing the child's wounds were not relevant to my decision," and explained that she had relied on her own observations of the photographs.

On January 30, 2019, another hearing was held. Jacob alleges that Stone only continued with the abuse charges as retaliation for his insistence on videotaping the home visit. According to Tina Moore, who had taken over the case from Stone, the judge told Hazelwood that the Clarks had the right to continue recording any home visits.

On February 3, 2019, Stone recorded in her notes that having conducted interviews and reviewed the evidence, she believed there was a substantial risk of abuse, and that the "family functioning" had "broke[n] down due to [Jacob's] temper." Her involvement with the case ceased after this point.

On August 1, 2019, the abuse cases were dismissed. During the entire pendency of these cases, from December 19, 2018, through August 1, 2019, the orders requiring the Clarks to refrain from using physical discipline on their children and to cooperate with CHFS were in place. The Clarks maintain that all the home visits, investigations, and the abuse cases themselves were all based on the initial testimony from Stone regarding the marks on N.C.'s arm, which the Clarks allege amounts to perjury. They allege that CHFS was acting based on religious animus against Jacob, whom CHFS employees referred to as "the crazy preacher," according to Moore. The Clarks further allege that the investigation caused substantial interference to their fundamental right to make decisions concerning how to raise their children.

In November 2019, Jacob and Genetta, for themselves, and on behalf of H.C., sued Stone, Campbell, and Hazelwood in both their individual and official capacities. They also sued a CHFS regional supervisor, Marcus Haycraft, and Cabinet Secretary Eric Friedlander in their official capacities.[2] The Clarks sought prospective, declaratory and injunctive relief against all five of the official capacity defendants because title 922, section 1:330, subsection 2(5)(f) of the Kentucky Administrative Regulations, which offers guidance to CHFS workers on when to investigate corporal punishment as child abuse, chilled the exercise of their constitutional right to dictate how to raise their children. They sued the three individual capacity defendants for violations of their First, Fourth, and Fourteenth Amendment rights, and filed a supplemental state law claim against them for malicious prosecution.

---

[2]The complaint initially named Adam Meier as a defendant, but Friedlander was substituted for Meier when the Kentucky Governor appointed him as the acting Cabinet Secretary for CHFS.

The district court dismissed the official capacity claims for declaratory and injunctive relief for lack of Article III standing.  It also dismissed the suit against Stone, Campbell, and Hazelwood in their individual capacities, reasoning that the defendants were all protected by absolute and qualified immunity.  The court then declined to exercise jurisdiction over the supplemental state law claim and dismissed it without prejudice.

This timely appeal followed.

## III.  ANALYSIS

### A.  The District Court Did Not Err in Dismissing the Official Capacity Claims for Lack of Article III Standing

We review de novo determinations of a plaintiff's standing to pursue claims for declaratory or injunctive relief.  *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 405 (6th Cir. 2019).  Here, because the plaintiffs' suit was dismissed at the pleading stage we are required to "accept as true all material [factual] allegations of the complaint."  *White v. United States*, 601 F.3d 545, 551 (6th Cir. 2010) (alteration in original) (quotation omitted).

The plaintiffs carry the burden of establishing subject matter jurisdiction.  *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).  To have Article III standing the plaintiff must satisfy three elements: (1) "the plaintiff must have suffered an 'injury in fact'; (2) that injury must have been 'cause[ed]' by the defendant's conduct; and (3) the injury must be 'redress[able] by a favorable decision.'"  *Bearden v. Ballad Health*, 967 F.3d 513, 516 (6th Cir. 2020) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  At issue in this case is the injury in fact requirement.  In cases dealing with declaratory and injunctive relief plaintiffs "must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review."  *Grendell v. Ohio Sup. Ct.*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)).

In order to satisfy the injury in fact requirement of Article III standing the "threatened injury must be *certainly impending*."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Speculative allegations "of possible future injury are not sufficient." *Id.* (quotation omitted). The Supreme Court has specifically noted that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (alteration in original) (quotation omitted).

The Clarks sued several CHFS employees in their official capacity, seeking prospective declaratory relief because they claim that they fear engaging in reasonable corporal punishment of their children. *See Ex parte Young,* 209 U.S. 123, 156 (1908) (allowing claims against state officials "who threaten and are about to commence proceeding . . . to enforce against parties affected an unconstitutional act."). Specifically, they challenge 922 KAR 1:330 § 2(5)(f) as unconstitutional. The challenged portion of the regulation reads as follows: "The following criteria shall be used in identifying a report of abuse, neglect, or dependency *not* requiring a child protective services investigation or assessment . . . Pursuant to KRS 503.110(1), corporal punishment appropriate to the age of the child, without an injury, mark, bruise, or substantial risk of harm . . . ." 922 KAR 1:330 § 2(5)(f) (emphasis added). The Clarks suggest that by negative implication this regulation establishes that any corporal punishment that leaves a "mark" constitutes evidence of abuse that requires further investigation. They argue that this regulation violates the Due Process Clause of the Fourteenth Amendment as well as KRS § 503.110(1), which establishes a parental right to use reasonable corporal punishment on one's children. Moreover, they claim that 922 KAR 1:330 § 2(5)(f) too easily enables baseless prosecutions and therefore chills their ability to use corporal punishment on their children without fear of being investigated for abuse.

The district court correctly found that the Clarks lack standing to bring this claim. Existing case law makes clear that their claims are too speculative to satisfy the Article III standing requirements. In *Barber v. Miller*, the father of a minor child who had been removed from his custody after being interviewed by a social worker at school challenged a Michigan statute that authorized public schools to allow in-school interviews of minor children without parental consent. 809 F.3d 840, 843 (6th Cir. 2015). This court found that Barber lacked standing because he "provided no evidence that he ha[d] been threatened with further or repeated

removals of [his child] or future proceedings in family court." *Id.* at 848. We found that "Barber's allegations fail[ed] to establish that this scenario certainly impends." *Id.* at 849. Indeed, though there was even a follow-up visit from a social worker after the minor had been returned to his father's custody, this court found that the risk of future harm from the statute was too speculative to confer standing. *Id.*

Similar to the plaintiffs in that case, the Clarks here have failed to demonstrate that their rights will certainly be violated in the future as a result of the challenged regulation. While the previous actions of CHFS may be "'evidence bearing on whether there is a real and immediate threat of repeated injury.' . . . However, where the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief.'" *Grendell*, 252 F.3d at 833 (quoting *Lyons*, 461 U.S at 102). To demonstrate certain future injury the Clarks must show it is likely that: (1) they will use corporal punishment on one or more of their children that will leave a mark or visible sign of injury; (2) someone will report the mark to CHFS; (3) CHFS will interpret the mark as evidence of child abuse; (4) as a result of learning about this mark CHFS will open a child abuse investigation into the Clarks; (5) the investigation itself will interfere with Jacob and Genetta Clark's rights to parent their children as they see fit.[3] This chain of events is simply too speculative to confer standing. *See Grendell* at 833 (finding that a four-step chain of events was too attenuated to demonstrate injury in fact). Here, there has been no sign that CHFS will further investigate the Clarks and they have not demonstrated the aforementioned chain of events is sufficiently certain to occur such that future injury is certainly impending.

The Clarks' argument that their parental rights have been chilled due to fear of false prosecution for child abuse is also unavailing because they have failed to demonstrate false prosecution with any level of certainty. *See White*, 601 F.3d at 553–54 (finding that chicken breeders challenging anti-cockfighting legislation lacked standing where they alleged that they transported chickens for legal purposes but feared false prosecution for being mistakenly taken to be transporting illegal fighting gamecocks, because the "threat of injury . . . rest[s] on a string of

---

[3]The inquiry does not end at step 4 because "[m]ere investigation by authorities into child abuse allegations without more . . . does not infringe upon a parent's right to custody or control of a child." *Kottmyer v. Maas*, 436 F.3d 684, 691 (6th Cir. 2006).

actions the occurrence of which is merely speculative"). While there are instances in which "chill" is sufficient to establish an injury in fact, the Supreme Court has explicitly required that the "[challenged] government power [be] regulatory, proscriptive, or compulsory in nature, and [that] the complainant was either presently or prospectively subject to the regulations, proscriptions or compulsions." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). The regulation the Clarks are challenging is neither proscriptive nor compulsory. The Clarks argue that the statutory language "[t]he following criteria shall be used in identifying a report of abuse, neglect, or dependency not requiring a child protective services investigation or assessment: . . ." demonstrates that this regulation goes beyond being internal guidance for CHFS workers. They are wrong. The challenged "mark" provision is one factor for CHFS workers to consider, and the guideline simply suggests that corporal punishment that does not result in a mark is appropriate corporal punishment. It does not require mandatory investigation of any report that does involve a mark, but merely advises that this should be one factor CHFS workers should consider when deciding whether to open an investigation. Their fear of being wrongfully prosecuted for lawful corporal punishment is analogous to the subjective fear of the gamecock breeders in *White*. The Clarks may well be afraid of future investigations because of this provision, but "the mere subjective fear that [they] will be subjected again to an allegedly illegal action is not sufficient to confer standing." *Hange v. City of Mansfield*, 257 F. App'x 887, 891 (6th Cir. 2007).

Because standing is a threshold issue and the Clarks have failed to satisfy their burden of establishing subject matter jurisdiction, we affirm the district court's dismissal of the official capacity claims.

**B. The District Court Did Not Abuse Its Discretion When It Decided not to Convert the Rule 12(c) Motion into a Motion for Summary Judgment on the Individual Capacity Claims**

Both the Clarks and the individual capacity defendants attached and referred to documents outside of the pleadings in their motions. The Clarks therefore argue that the district court erred by not converting the Rule 12(c) motion for judgment on the pleadings into a Rule 56 motion for summary judgment because they allege it considered some of the defendants' documents but not the Clarks'.

We review the district court's procedural decision not to convert the defendant's Rule 12(c) motion into a motion for summary judgment for an abuse of discretion. *See Bennett v. City of Eastpointe*, 410 F.3d 810 816 (6th Cir. 2005). Federal Rule of Civil Procedure 12(c) requires a court to convert a motion for judgment on the pleadings to a summary judgment motion "where matters outside the pleadings are presented to and not excluded by the court." Notwithstanding, documents attached to the pleadings are considered a part of the pleadings and may therefore be "considered without converting a motion to dismiss into one for summary judgment." *Com. Money Ctr. Inc., v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007); *see also Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) ("In reviewing a motion to dismiss the Court 'may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein.'" (quoting *Bassett v. Natl. Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008))).

The district court listed numerous documents submitted outside of the pleadings by both parties but chose not to consider most of them. Of the seven attachments submitted by the defendants, it found that it could consider three of them without converting the motion into one for summary judgment: the CHFS records, color photos of N.C.'s arms, and the video recordings of the family court hearings. It explicitly stated that it could consider these exhibits because they "pertained to the underlying abuse cases," without which the Clarks would have no claims.[4] The Clarks claim that the court should have treated their own submitted documents similarly because, they argue, many of them also pertained to the abuse cases. Specifically, they suggest that the affidavit of Moore speaks to the hostility towards the plaintiffs' religious beliefs, and that the affidavit of Jacob reaffirmed most of the factual allegations of the complaint.

The three documents examined by the district court all merely corroborate the facts alleged in the Clarks' complaint. In that complaint the Clarks alleged, amongst other things, that a child abuse investigation took place, that a photo was taken of N.C.'s arm, and that they participated in a hearing related to this investigation. The three exhibits considered by the

---

[4]Courts may take judicial notice of the proceedings of other courts of record. *See Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980).

district court all speak to the existence of that investigation and the events that took place. This is how they "pertain to the underlying abuse cases." The district court did not consider them as evidence of whether the Clarks' First, Fourth, and Fourteenth Amendment rights had been violated.

By contrast, the affidavits of Moore and Clark that were submitted by the plaintiffs pertain to the First, Fourth, and Fourteenth Amendment claims at issue in this case. They contained potentially relevant information about religious animus, perjury, and home searches— all pertinent facts for proof of the legal claims in *this* case— but did not speak to the underlying abuse cases directly. The same is true for the other documents submitted by defendants, which included redacted domestic violence records related to the Clarks, the affidavit of Judge Embry, an affidavit from Assistant County Attorney Durham, and the CHFS standards of practice, because those documents were offered to refute the legal claims in the instant case, not to provide a factual background for the underlying abuse cases themselves. Because the court did not consider these other documents and instead limited its consideration to only those submitted documents that pertained directly to the facts of the underlying abuse cases, it did not abuse its discretion by declining to convert the motion to one for summary judgment.

"If we find no abuse of discretion in the district court's procedural decision, we review the decision substantively." *Bennett*, 410 F.3d at 816. As such, we must now consider whether dismissal on the pleadings was correct.

## C. The District Court Did Not Err in Dismissing the Individual Capacity Claims

### 1. Standard of Review

As discussed, the district court dismissed the individual capacity claims on the pleadings under Federal Rule of Civil Procedure 12(c). This court reviews a judgment on the pleadings under the same de novo standard we apply to 12(b)(6) motions for dismissal. *Com. Money Ctr.*, 508 F.3d at 336. To survive a motion to dismiss a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

We "construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law." *Comm. Money Ctr.,* 508 F.3d at 336. We need not, however, accept as true the "plaintiff's legal conclusions or unwarranted factual inferences." *Id.* Furthermore, this court may take judicial notice of public records, and we are not required to accept as true factual allegations that are contradicted by those records. *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017).

### 2. Absolute Immunity

As an initial matter, we note which of the defendants' actions are not at issue here due to the doctrine of absolute immunity. As the district court held, Stone is absolutely immune for filing the initial abuse petitions on December 19 before Judge Embry because social workers are given absolute immunity for initiating judicial proceedings. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 421 (6th Cir. 2001). Similarly, Stone's discussion and preparations of those petitions in conjunction with Assistant County Attorney Durham are also protected. *Holloway v. Brush*, 220 F.3d 767, 774–75 (6th Cir. 2000) (en banc). Any statements given under oath at that time or at subsequent court proceedings are shielded by absolute immunity. *Barber*, 809 F.3d at 844.

### 3. Qualified Immunity

The district court analyzed the remaining investigatory actions, including the home visits and subsequent proceedings, undertaken by Stone, Campbell, and Hazelwood under a qualified immunity framework. In the Sixth Circuit, when a defendant invokes qualified immunity it becomes the plaintiff's burden to demonstrate: (1) that the defendant violated a constitutional right and (2) that this right was clearly established at the time of the alleged violation. *Id.* If the court finds that the plaintiff's right was not clearly established, we can start with the second factor and do not "need to determine whether the alleged conduct was in fact unconstitutional." *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555, U.S. 223, 236–43 (2009)). When a qualified immunity defense is asserted at the pleading stage, we have historically found that the inquiry should be limited to the "clearly established" prong of the

analysis if feasible.  *See Barber* 809 F.3d at 844; *Lyons v. City of Xenia,* 417 F.3d 565, 582 (6th Cir. 2005) (Sutton, J., concurring).

In the qualified immunity context, a right is considered clearly established when existing precedent has placed the question "beyond debate" and "any reasonable official in the defendant's shoes would have understood that he was violating [the right]".  *Schulkers*, 955 F.3d at 533 (quotation omitted).  "When determining whether the right is clearly established, 'we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal.'"  *Barber*, 809 F.3d at 845 (quoting *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012)).

### 4.  Fourteenth Amendment Claims

The Clarks argue that the defendants violated their substantive due process rights under the Fourteenth Amendment by depriving them of their parental liberty interest in disciplining their children.  They assert that the no discipline order interfered with their right to use reasonable corporal punishment on their children.  The defendants suggest that they are entitled to absolute immunity for the court order because any deprivation of rights stemming from that order was perpetrated by the juvenile courts, not the defendants.  They also argue that they are entitled to qualified immunity on this issue because there is no clearly established right to use corporal punishment on children.

When examining a substantive due process claim we apply a two-part test.  We first "ask whether the plaintiff has shown a deprivation of a constitutionally protected liberty interest," then we consider "whether the government's discretionary conduct that deprived that interest was constitutionally repugnant."  *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 756–66 (6th Cir. 2020) (cleaned up).

Defendants first argue that they cannot be liable for the no discipline order because to the extent that the Clarks were deprived of any fundamental rights it was the juvenile court, not the defendants, that burdened them.  The defendants cite to *Pittman v. Cuyahoga County Department of Children & Family Services.*, where this court held that where the juvenile court has the ultimate authority to do something, social workers cannot be sued for substantive due

process harms because the court, not the social workers, is the cause of the harms.  640 F.3d 716, 728–29 (6th Cir. 2011).  However, as the district court recognized, there is a general exception to this absolute immunity where "the court order is based on a bad-faith child-services investigation."  *Heithcock v. Tenn. Dep't of Children's Servs.*, No. 3:14-CV-2377, 2018 WL 1399586, at *6 (M.D. Tenn. Mar. 20, 2018).  Because the Clarks have alleged bad faith on the part of Stone and the other defendants in how they presented the investigation to the juvenile court, they have overcome this initial hurdle.  We therefore must consider whether they have asserted a claim for a violation of a clearly established right.

While the plaintiffs cite an ample number of cases that support the general notion that the Due Process Clause protects the right to bring up one's children, they point to no case law from either the Supreme Court or this circuit that indicates there is a clearly established right to use corporal punishment that leaves marks.  *Cf. Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (finding that there is no Fourteenth Amendment Due Process right to assisted suicide); *Meyer v. Nebraska*, 262 U.S. 390, 399, 401–02 (1923) (finding that a law restricting foreign-language education violated the Fourteenth Amendment's Due Process Clause); *Pierce v. the Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (striking down a law that required all children to attend public school); *Ingraham v. Wright,* 430 U.S. 651, 681 (1977) (holding that reasonable "corporal punishment serves important educational interests" and is therefore permissible in public schools); *Troxel v. Granville*, 530 U.S. 57, 60, 66, 75 (2000) (finding that the Due Process Clause protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children" and striking down a law that allowed any person to try to obtain visitation rights over parental objections); *Doe v. Heck*, 327 F.3d 492, 523 (7th Cir. 2003) ("[T]he plaintiff parent's liberty interest in directing the upbringing and education of their children includes the right to discipline them by using reasonable, nonexcessive corporal punishment.")

While all of the aforementioned cases consider a general right for parents to determine how to raise their children, only two consider the use of corporal punishment, and neither finds a right to use corporal punishment that leaves marks.  In *Ingraham*, the Supreme Court found that public schools could engage in "limited corporal punishment" without running afoul of the

Eighth and Fourteenth Amendments.  430 U.S. at 676.  In *Heck* the Seventh Circuit found that parents had the "right to physically discipline their children, or to delegate that right to private school officials."  327 F.3d at 525–26.

The Clarks next cite to *Schulkers* as evidence that their right to use corporal punishment that leaves marks on their children is clearly established within this circuit.  In that case, we found that a parent's due process rights were violated when a prevention plan limited her ability to decide when and where she could be alone with her children.  955 F.3d at 540.  Notably, in that case the state found that there were no reasonable grounds to suspect child abuse at the time the order went into effect.  *Id*.

The case before us is readily distinguishable from cases described above.  First, *Schulkers* did not involve the use of corporal punishment at all.  And, unlike the court there, the juvenile court in our case put the no discipline order in place after viewing photographs of N.C.'s arm and considering the evidence presented from the interviews with the Clark children.[5]  Second, it is important to note that both *Ingraham* and *Heck* allow for the use of *reasonable* corporal punishment.  Nothing in Kentucky law conflicts with that premise.  KRS §503.110 specifically provides that parents may use physical force when disciplining their children.  However, 922 KAR 1:330, the regulation at issue in this case, merely offers guidance as to the limitations of that right.  It allows for the use of "corporal punishment appropriate to the age of the child without an injury, mark, bruise or substantial risk of harm."  This regulation is perfectly compatible with the Courts' holdings in *Ingraham* and *Heck*, which contain no indication that parents have an *unlimited* right to use *whatever* force they deem fit to discipline their children.  The right that the Clarks are asserting, that is, the right to use corporal punishment even if it leaves more than fleeting marks on a child, is not clearly established.

While we can state with ease that there is a general right to use reasonable corporal punishment at home and in schools, that right is not an unlimited one.  The Clarks have offered

---

[5]The Clarks allege that the order was fraudulently obtained because they claim that Stone perjured herself by telling the judge that N.C.'s arms had "lacerations" and "abrasions," which they claim is false.  But, as stated earlier, Judge Embry provided in her affidavit, that she issued the no discipline order based purely on the evidence in the photographs and the children's accounts of how they were disciplined.

no authority that imposing corporal punishment that leaves marks is reasonable and is therefore a protected right. We find, therefore, that the district court did not err in dismissing the Clarks' Fourteenth Amendment claims.

### 5. Fourth Amendment Claims

The Clarks contend that Hazelwood, Campbell, and Stone violated their Fourth Amendment rights when they entered their home without a warrant and without an applicable exception to the warrant requirement. The defendants contend that they did not violate the Fourth Amendment because they entered pursuant to the court orders from Judge Embry and Judge Goff, and they argue that if they did violate the Clarks' rights they are entitled to qualified immunity on this claim.

Social workers are generally governed by the Fourth Amendment's warrant requirement. *Andrews*, 700 F.3d at 859. Here, the court order fell well below the requirements of a valid warrant. The order contains no facts that detail probable cause, nor does it describe with any particularity the area of the home to be searched. *See United States v. Beals*, 698 F.3d 248, 264 (6th Cir. 2012) (detailing requirements for valid search warrants). The defendants do not assert that they entered the home due to exigency or under any other exception to the warrant requirement. The district court was therefore correct in finding that the entries into the Clarks' home were Fourth Amendment violations.

Our inquiry then becomes whether a reasonable social worker would have known based on these particular circumstances that their actions were violating the Clarks' constitutional rights. *See District of Columbia. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("[A] legal principle [must be settled law, and it must] clearly prohibit the officer's conduct in *the particular circumstances* before him") (internal citations omitted) (emphasis added); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (explaining that plaintiffs must identify a case with a similar fact pattern to the circumstances at issue in order to show that officers had sufficient warning about what the law requires). And while it is established that a social worker does need a warrant to search a home, this court has recognized that the boundaries of that requirement are not clearly established. *Andrews*, 700 F.3d at 863 (finding that the law was

"hazy" as to whether a social worker could rely on the good faith guidance from a police officer that entry was lawful because of the "lack of clarity" in the law surrounding social workers and the Fourth Amendment).

In *Kovacic v. Cuyahoga County Department of Children & Family Services.*, we found that it was clearly established that a social worker needs a warrant before *removing* a child from the home.  724 F.3d 687, 699 (6th Cir. 2013).  However, we also recognized that there "remain unresolved issues related to the Fourth Amendment" and that there was a "lack of clarity" present in cases surrounding the warrantless *entry* of social workers into the home.  *Id.*  The most on-point case for the situation here is *Andrews,* where we found that social workers entering the home without a warrant do violate the Fourth Amendment, but that they may rely upon the good faith instruction of police officers about the legality of their entry.  700 F.3d at 863.

As the district court recognized, however, *Andrews* does not clearly establish that a reasonable social worker in *this situation* would know that his conduct was violating the Fourth Amendment.  First, Judge Goff stated in open court that the Fourth Amendment did not fully apply in this context.  While his statement may have been in error, it was not unreasonable for the defendants to rely upon instruction from a judge to conclude that their conduct was allowed.  More importantly, each home visit by CHFS workers was conducted under the direct provenance of a court order issued specifically for this case.  No such order existed in either *Andrews* or *Kovacic*, and it is significant in our assessment of what a social worker ought to have known about the legality of their conduct.  Given that we have previously found that social workers may rely on police officers in assessing whether they are allowed to enter a home, it is hard to imagine that a reasonable social worker would not also believe that they could rely on an order from a judge, an even more authoritative source on the law.  And indeed, at their first home visit Stone and Campbell were accompanied by a police officer.  Despite Jacob's assertion that his rights were being violated, Stone and Campbell proceeded with the visit.  If nothing else, this demonstrates an implicit endorsement from the police officer, upon which Stone and Campbell were entitled to rely.  *Andrews*, 700 F.3d at 864.

Because the presence of the court order meaningfully distinguishes this case from *Andrews*, a reasonable social worker in the position of the defendants would not have understood

that he was violating the Clarks' Fourth Amendment rights. Indeed, this case represents precisely the type of haziness that *Andrews* alluded to in this area of law. Since the doctrine of qualified immunity is designed to protect "all but the plainly incompetent or those who knowingly violate the law," we agree with the district court that the plaintiffs have not overcome the qualified immunity defense. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).[6]

### 6. First Amendment Claims

#### a. Right to Film the Home Visits

The Clarks next assert that the district court erred in dismissing their First Amendment claim that they were retaliated against for exercising their right to record the defendants during the home visits. For their part, the defendants claim that this right is nonexistent, or at least is not clearly established. They further argue that the Clarks are unable to demonstrate a causal connection between their request not to being recorded and the alleged retaliatory actions.[7] We note that Jacob *was* able to film the home visits and does not appear to have alleged a retaliatory action for doing so other than the continuation of the investigation beyond this first visit.

To assert a First Amendment retaliation claim, plaintiffs must establish that: (1) they engaged in constitutionally protected speech, (2) an adverse action taken against them caused an injury that would chill a person of ordinary firmness from continuing the speech, and (3) that action was motivated at least in part by the protected speech. *Ryan v. Blackwell*, 979 F.3d 519, 526 (6th Cir. 2020). Plaintiffs must "be able to prove that the exercise of the protected right was

---

[6]Notably, Jacob was present in court when Judge Goff explained that the order required him to allow home visits. Though he did request a more detailed explanation of what the social workers would be looking for, Jacob did not indicate that he would require a warrant before allowing entry to his home, which at least implies that he may have been consenting to the search. While he did not immediately consent to the search when defendants arrived for the first home visit, it is not illegal for the defendants to have warned him that refusal to cooperate could result in Judge Goff finding him in contempt of court to secure his consent. *See United States v. Jones*, 647 F. Supp. 2d. 1055, 1059 (W.D. Wis. 2009) *aff'd*, 614 F.3d 423 (7th Cir. 2010) (finding that telling a non-consenting party to a search that officers would call Child Protective Services to remove the children if she did not consent was a fair tactic that did not render consent involuntary). Jacob claims that he was coerced into allowing the searches, but any coercion derives from the court order, not from the conduct of the defendants themselves.

[7]The defendants attempt to argue that they are absolutely immune from suit for subsequent further investigation of the Clark family following this first home visit, but this argument is unavailing because social workers do not enjoy absolute immunity from suit for actions that are investigatory in nature. *Holloway*, 220 F.3d at 774. Subsequent home visits and abuse investigations fall squarely within this camp.

a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith v. Campbell* 250 F.3d 1032, 1037 (6th Cir. 2001).

The Clarks assert that they had a clear First Amendment right to record the home visits conducted by Hazelwood, Stone, and Campbell. In doing so, they cite to numerous cases from other circuits and one from the Northern District of Ohio that stand for the proposition that there is a constitutional right to film an encounter with a police officer. *See Glik v. Cunniffe*, 655 F.3d 78, 84–86 (1st Cir. 2011) (finding a First Amendment right to film police officers performing their duties in public spaces); *Gericke v. Begin*, 753 F.3d 1, 7–10 (1st Cir. 2014) (same); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3rd Cir. 2017) (same); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–90 (5th Cir. 2017) (adopting *Glik*); *ACLU v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012) (allowing the audio recording of the police in public spaces; *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (permitting the filming of police conduct subject to reasonable time place and manner restrictions); *Crawford v. Geiger*, 131 F. Supp. 3d 703, 714–15 (N.D. Ohio 2015) (concluding that "there is a First Amendment right openly to film police officers carrying out their duties in public"),[8] *rev'd on other grounds*, 656 F. App'x 190 (6th Cir. 2016). The Clarks reason that because we have held that social workers are held to the same standard as police officers when it comes to other constitutional rights, the cases listed above are sufficient to demonstrate that the right to film interactions with a social worker is clearly established. We disagree.

First and foremost, the Clarks have not cited a single case that applies this right to social workers. While we have clearly established that a social worker is not excepted from the Fourth Amendment, this concerns an entirely different set of rights. We should not take the equivalence of social workers and police officers in one context as determinative in a completely different area of civil rights law. Doing so would violate our mandate to avoid construing rights too generally. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695, F.3d 505, 508 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

---

[8]This was the second time the district court considered this case. In *Crawford v. Geiger*, 996 F. Supp.2d 603, 616 (N.D. Ohio 2014), the court found not only that the right to film a public encounter with the police existed, but that it was also clearly established. It then reversed itself in part, finding that the right existed, but was not clearly established.

Furthermore, the cases cited by the plaintiffs do not demonstrate that the right to film a social worker during a home visit was clearly established. A single district court opinion (and here, a district court opinion emanating from an entirely different district than where the events at issue took place) is not sufficient to demonstrate that a right is clearly established in this circuit for purposes of qualified immunity. *See Hall v. Sweet*, 666 F. App'x 469, 481 (6th Cir. 2019) ("A single district court opinion is not enough to pronounce a right is clearly established for purposes of qualified immunity.") And, as the district court recognized, other district courts in this circuit have found that the right is not clearly established. *See e.g., Williams v. City of Paris*, No. 5:15-108-DCR, 2016 WL 2354230, at *4 (E.D. Ky. May 4, 2016); *Davis-Bey v. City of Warren*, No. 16-CV-11707, 2018 WL 895394, at *6 (E.D. Mich. Jan. 16, 2018). The existence of this conflict is itself evidence that the right was not sufficiently established such that any reasonable social worker in the defendants' shoes would have clear notice of the right.

Moreover, the Clarks' arguments fail even if we do not find that the defendants are entitled to qualified immunity on this issue because they have failed to allege facts that would demonstrate that a retaliatory action was taken against them that was motivated by their demand to record the home visits. It is worth noting that despite the protests of the social workers, Jacob was allowed to film the home visits, and was never subject to arrest or legal sanctions for doing so.

It is not fully clear what the Clarks are alleging was the retaliatory action for filming the visits, but it appears that they suggest that the continuation of the investigation beyond the initial home visit was itself retaliatory. They offer no reason to think that the investigation would have ended after the first home visit but-for Jacob's demand to film the visit. Without such evidence, the Clarks cannot show the necessary causation that their assertion of their alleged right to film social worker visits is what caused the alleged retaliation. As stated earlier, while we must accept the plaintiff's factual allegations as true at the pleading stage, we need not accept their legal argument that the continuation of the investigation was somehow retaliatory. We therefore agree with the district court that the Clarks have failed to state a plausible First Amendment retaliation claim.

### b. Free Exercise Claim

The Clarks allege that the defendants' institution of the investigation and continuation of it were acts of religious hostility that violate the First Amendment. The defendants point out that prior to the beginning of the investigation they were unaware of the Clarks' religious beliefs (a fact uncontested by the Clarks), and further argue that the Free Exercise Clause of the First Amendment does not excuse the Clarks' from adhering to otherwise valid child-safety laws.

The Clarks did not allege which law violated their right to religious freedom, so the district court inferred that they were raising a Free Exercise challenge to the same regulation they challenged in the official capacity claims. The district court held that Clarks' allegations were "severely lacking." It was correct in finding as much.

The Supreme Court has repeatedly found that although targeting religious beliefs is never acceptable, a generally applicable law that incidentally burdens one's free exercise rights will typically be upheld. *See Emp't Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990) (listing cases), *superseded by statute*, Religious Freedom Restoration Act of 1993, Pub. L. No. 103–141, 107 Stat. 1488, *as recognized in Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020). Laws are not neutral when their purpose is "to infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). To the extent the plaintiffs are challenging 922 KAR 1:330(2)(5)(f), the same regulation they challenged in their claims for declaratory and injunctive relief, they have failed to state a plausible Free Exercise claim.[9] In addition to never actually referring to the law itself, the Clarks do not allege that the law was enacted with the intent of discriminating against religion. *See New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 591 (6th Cir. 2018) (explaining that the "incidental effect of suppression is permissible under the Free Exercise Clause absent restrictive intent").

Furthermore, any challenge to this regulation would likely survive strict scrutiny. If the object of a law is to restrict practices because of their religious motivation it is "invalid *unless* it is justified by a compelling interest and is narrowly tailored to advance that interest." *Church of*

---

[9]The plaintiffs do not specify the nature of their "religious hostility claim." The district court construed their complaint as being against the above-mentioned law. The Clarks do not challenge this characterization in their brief but generally claim the district court "simply ignored the relevant law."

*Lukumi Babalu*, 508 U.S. at 533 (emphasis added). Here, the state certainly has a compelling interest in protecting children from physical abuse, and the regulation is written such that it explicitly does not prohibit corporal punishment that does not leave marks, bruises, etc. Thus, the regulation is narrowly tailored and serves a compelling government interest.**10**

In their complaint the Clarks rely heavily upon the affidavit of former CHFS employee Moore. First, we reiterate that it was procedurally correct for the district court not to consider this affidavit. But even if it had considered it, the affidavit does not save the Clarks' claims. On the one hand, Moore's accusations that Jacob was routinely referred to at CHFS as "the crazy preacher" and that there was "extreme hostility" towards his religious briefs is deeply troubling. Had the Clarks alleged that they were treated differently from other families who engage in corporal punishment because of this hostility, their claims would carry significantly more weight. However, the very affidavit that the Clarks claim gives color to their religious hostility claim also says it was the practice of the local CHFS "to pursue as abuse, any instance of corporal punishment," and "[a]ny instances of corporal punishment that could be corroborated were considered and written up as abuse." In other words, even if we take as true that CHFS employees thought Jacob was a "crazy preacher," this testimony suggests that it did not color the decision to investigate since they were pursuing *any* allegation of corporal punishment as a potential abuse case. Thus, the Clarks have not even plausibly alleged the law has been discriminatorily applied against them because of their religious beliefs. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1730 (finding that the disparity in treatment between bakers who refused to make anti-gay-marriage cakes and a baker who refused to make a custom wedding cake for a gay wedding reception was an indication of impermissible religious hostility).

Even taking the Clarks' allegations as true, as we are required to do when reviewing a Rule 12(c) dismissal, the Clarks have not stated a claim for a violation of their Free Exercise rights, and the district court therefore did not err in dismissing this claim.

---

**10**We also note that while there is a fundamental right for parents to raise their children as they see fit, there is no clearly established right to engage in corporal punishment that leaves marks. If such a right exists, and this regulation is seen to unduly burden it, then the defendants would be entitled to qualified immunity since it was not clearly established at the time this case took place.

### 7. Supervisory Liability Claims

The Clarks argue that Campbell and Hazelwood should both be liable for the conduct stemming from Stone's actions during the investigation and before the juvenile court. While this court has held that the failure to supervise is actionable, we need not consider the issue here. Because Stone's conduct was not impermissible, there is nothing to hold Hazelwood and Campbell liable for. Because we have found for Stone on all the underlying claims, this claim for supervisory liability melts away.

## IV. CONCLUSION

Because the Clarks lack standing to bring the official capacity claims, the district court was correct to dismiss the claims for lack of subject matter jurisdiction. Since the Clarks failed either to state a claim or to overcome qualified immunity on the remaining individual capacity claims, the court did not err in dismissing them on the pleadings. It was therefore also not error for the district court to dismiss the pendant state law malicious prosecution claim without prejudice. We **AFFIRM** the rulings of the district court.