*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BUXTON CRAIG HEYERMAN,

                *Plaintiff-Appellant,*

     *v.*

COUNTY OF CALHOUN, CALHOUN COUNTY
PROSECUTOR'S OFFICE, named as "Calhoun
County Prosecutor," and SUSAN K.
MLADENOFF,

                *Defendants-Appellees*,

MICHIGAN DEPARTMENT OF CORRECTIONS,
PATRICIA L. CARUSO, MICHIGAN PAROLE
BOARD, and BARBARA S. SAMPSON,

                *Defendants.*

No. 10-2322

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:09-cv-411—Robert J. Jonker, District Judge.

Argued: April 17, 2012

Decided and Filed: May 29, 2012

Before: GIBBONS and SUTTON, Circuit Judges; DUGGAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** James A. Sauber, IDG PLLC, Battle Creek, Michigan, for Appellant. Jason D. Kolkema, JOHNSON, ROSATI, LABARGE, ASELTYNE & FIELD, P.C., Lansing, Michigan, for Appellees. **ON BRIEF:** James A. Sauber, IDG PLLC, Battle Creek, Michigan, for Appellant. Jason D. Kolkema, Patrick A. Aseltyne, JOHNSON, ROSATI, LABARGE, ASELTYNE & FIELD, P.C., Lansing, Michigan, for Appellees.

     DUGGAN, D. J., delivered the opinion of the court in which GIBBONS and SUTTON, JJ., joined. SUTTON, J. (pp. 10–12), also delivered a separate concurring opinion.

_____

[*]The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

DUGGAN, District Judge.  Plaintiff-Appellant Buxton Craig Heyerman was imprisoned for more than seventeen years as a pretrial detainee after a state appellate court reversed his criminal conviction and remanded the matter to the trial court.  He filed a civil rights action pursuant to 42 U.S.C. § 1983 against Defendants-Appellees, alleging that this lengthy detention violated his Sixth Amendment speedy-trial rights.  Defendants-Appellees are not liable for the alleged constitutional violation under § 1983, however.  Therefore, we affirm the district court's grant of summary judgment in their favor.

I.

In January 1988, a jury in Calhoun County, Michigan, found Buxton Craig Heyerman (hereafter "Heyerman") guilty of one count of first-degree criminal sexual conduct and the trial court sentenced him to a prison term of twenty to forty years.  On June 8, 1989, the Michigan Court of Appeals reversed Heyerman's conviction and remanded the matter to the trial court.  Heyerman, through his appellate counsel, was informed and received a copy of the appellate court's decision.

On June 9, 1989, the state trial court entered an acknowledgment of the reversal and remand in its Registry of Actions.  On July 6, 1989, the Remittur of Record was entered in the appellate court, ordering *inter alia* the clerk of the lower court to inform the parties of the decision pursuant to Michigan Court Rule 7.210.[1]

According to the judge who presided over Heyerman's criminal trial, the procedure in place in his court in 1989, was to notify the parties and schedule a status conference when a case was remanded from the court of appeals.  For unknown reasons,

---

[1] Michigan Court Rule 7.210(I) (subsection J at the time of the Michigan Court of Appeals' decision in Heyerman's case) provides: "The trial court . . . shall promptly notify all parties of the return of the record in order that they may take the appropriate action in the trial court . . . under the Court of Appeals mandate."

however, this procedure was not followed in Heyerman's case. Further, the trial court judge only became aware of the reversal and remand in 2007.

Conrad Sindt, Calhoun County's Prosecuting Attorney from 1981 through 1990 (a period covering Heyerman's trial and conviction and the appellate court's reversal and remand), also did not become aware of the Michigan Court of Appeals' decision until 2007. The procedure in the prosecutor's office in 1989 was for the appellate clerk in the office to receive the decision from the court of appeals and forward it to the assigned assistant prosecuting attorney for further action and to await notification from the trial court. The assistant county prosecutor who handled Heyerman's criminal trial and appeal left the prosecutor's office within months of the Michigan Court of Appeals' decision.

No action was taken in Heyerman's criminal case after the record was returned to the Calhoun County Circuit Court until early 2007, when the case was brought to the attention of the State after Heyerman filed a *pro se* writ of habeas corpus (although in the wrong court).[2] The judge overseeing the criminal proceedings then appointed counsel to represent Heyerman, who subsequently file a motion to dismiss on speedy-trial grounds. On May 11, 2007, following a series of hearings, the trial court ruled that Heyerman's right to a speedy trial under the Sixth Amendment had been violated and the only remedy was to dismiss the criminal charge with prejudice. The prosecutor did not appeal the decision.

It is not evident from the record who served as Calhoun County's Prosecuting Attorney immediately after Sindt and from January 2001 through December 2008. Defendant-Appellee Susan Mladenoff ("Mladenoff") served in that capacity from

---

[2]Although not relevant to the disposition of his § 1983 action– but included because many readers likely wonder– neither Heyerman nor his criminal defense attorney brought the unresolved matter to the attention of the trial court or prosecutor's office. In hearings before the trial judge, Heyerman's criminal defense attorney testified that he advised Heyerman "to stay put and quiet like a mouse" until the statute of limitations expired (which counsel incorrectly determined was ten years) because Heyerman likely would be convicted in a second trial and receive a sentence substantially longer than ten years. There is some evidence that Heyerman first consented to this strategy but then, at some point, disagreed and tried to get his attorney to bring his unresolved case to the trial court's attention. There is evidence that Heyerman brought the reversal of his conviction and remand order to the attention of prison authorities, as well. Heyerman successfully sued his defense counsel for legal malpractice.

January 1997 through December 2000, and was elected to another four years' term beginning January 2009. Mladenoff only became aware of Heyerman's criminal case in 2007, when she read a newspaper article concerning the hearings before the trial judge and the dismissal of the case on speedy trial grounds.

On May 6, 2009, Heyerman, with the assistance of counsel, filed this civil rights action against Calhoun County, the "Calhoun County Prosecutor's Office," Mladenoff in her individual and official capacities, the Michigan Department of Corrections ("MDOC"), the Director of MDOC, the Michigan Parole Board, and the Chairperson of the Michigan Parole Board. Heyerman never served the MDOC or Parole Board defendants and agreed to dismiss those defendants. The district court dismissed the "Calhoun County Prosecutor's Office," finding that it is a non-existent entity. The County and Mladenoff thereafter filed a motion for summary judgment, which the district court granted. The court concluded that Mladenoff is entitled to absolute prosecutorial immunity to the extent she is sued in her individual capacity and that Heyerman failed to demonstrate a municipal policy or practice that was a moving force behind the alleged constitutional violation to hold the County or Mladenoff in her official capacity liable. Heyerman timely appealed the court's decision and judgment.

## II.

The district court's grant of summary judgment is reviewed *de novo*. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). Summary judgment is appropriate if the materials in the record "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of proving the absence of a genuine issue of material fact and its entitlement to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All facts, including inferences, are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

III.

The district court granted summary judgment to Mladenoff in her individual capacity, concluding that Mladenoff's alleged failure to supervise and train her employees relative to their response to remand orders constituted activities "intimately associated with the judicial phase of the criminal process." R.54 at 6-7 (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). On appeal, Heyerman argues that Mladenoff's supervision and training responsibilities are administrative functions to which absolute prosecutorial immunity does not apply. *See Imbler*, 424 U.S. at 431 n.33; *see also Van de Kamp*, 555 U.S. at 343. We find it unnecessary to make this determination.

To state a cognizable claim against an individual under § 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law."[3] *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior. *See Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) (unpublished opinion) ("Personal involvement is necessary to establish section 1983 liability"); *see also Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) (noting that personal liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants").

There is no evidence that Mladenoff was directly responsible for the failure to act in response to the Michigan Court of Appeals' remand order. As indicated, Mladenoff first became aware of Heyerman's criminal case in 2007– at which time she

---

[3]To the extent this case raises the issue of whether damages can be awarded under § 1983 for a Sixth Amendment speedy trial violation, we do not need to reach this issue to dispose of this appeal. Therefore we do not reach it.

was not serving as the County's Prosecuting Attorney.  Heyerman nevertheless maintains that Mladenoff may be held personally liable based on her failure, as Calhoun County Prosecuting Attorney, to oversee the assistant county prosecutors' handling of cases remanded from the court of appeals.

Section 1983 liability, however, cannot be premised solely on a theory of respondeat superior, or the right to control employees. *Hays v. Jefferson Cnty.*, 668 F.2d 869, 872 (6th Cir. 1982).  Supervisory officials are not liable in their individual capacities unless they "either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id*. at 874.  Heyerman's attempt to hold Mladenoff liable in her individual capacity for her alleged failure to adequately supervise assistant county prosecutors or for her adherence to or continuation of a policy that, in Heyerman's words, "abdicated" her responsibility "to act on remand orders", "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008); *see also Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (indicating that where there is an absence of evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are properly deemed to be brought against them in their official capacities and are treated as claims against the county).  Municipal liability, however, also is not established in this case.

Municipal liability only attaches where a custom, policy, or practice attributable to the municipality was the "moving force" behind the violation of the plaintiff's constitutional rights. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010).  Heyerman asserts three theories to support municipal liability: (1) the prosecuting attorneys serving office during his pretrial detention– individuals with final decision-making authority– abdicated their responsibility to act on remand orders; (2) the County failed to institute a necessary and effective policy to respond to remand orders and instead left it for some unidentified person to put a case remanded by the appellate court

back on track; and/or (3) the County provided no training to its prosecutors on how to timely and adequately respond to a court of appeals' remand order to safeguard against constitutional deprivations.

Heyerman's first argument fails because there is no evidence that any of the County's prosecuting attorneys who served office from the time of the Michigan Court of Appeals' remand order were personally aware of the order. "[M]unicipal liability under § 1983 attaches where– and only where– a *deliberate choice* to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (emphasis added) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (" 'policy' generally implies a course of action consciously chosen from among various alternatives.")).

Heyerman's second and third theories are premised on the County's failure to act: the failure to institute a policy other than a policy of "wait and see" in response to remand orders (argument two), and the failure to train and supervise assistant prosecuting attorneys to respond to remand orders (argument three). A municipality may be liable under § 1983 for a failure to train its employees or to institute a policy to avoid the alleged harm where the need to act "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 387, 390 (1989). The occasional negligent administration of an otherwise sound policy is not sufficient to impose municipal liability. *See id*. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.").

Courts have identified two ways to demonstrate a municipality's need to act. The plaintiff can present evidence showing that the municipality possessed actual knowledge indicating a deficiency with the existing policy or training (or lack thereof), such as where there have been recurring constitutional violations. *See, e.g., Oviatt v. Pearce*,

954 F.2d 1470, 1473, 1477-78 (9th Cir. 1992) (finding that the county sheriff "was aware that 'from time to time' individuals were not arraigned [within the time prescribed by state law] because of mistakes made by the court or the jail"). Otherwise, the plaintiff must show that the need to act should have been "plainly obvious to the [municipality's] policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Canton*, 489 U.S. at 390 n.10. This arises "in a narrow range of circumstances" where "a violation of federal rights may be a *highly predictable* consequence of [the municipality's failure to act]." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) (emphasis added). For example, as the *Canton* Court provided, where city policymakers know that their police officers will be required to arrest fleeing felons and have armed the officers with firearms in part to accomplish this task, the need to train the officers in the constitutional limitations on the use of deadly force is "'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S. at 390 n.10.

The record contains no evidence of any case in Calhoun County, other than Heyerman's, where a defendant was not timely presented to the trial court after his or her case was remanded by the court of appeals. Thus this is not a circumstance where the need for action was "plainly obvious" to the municipality's policymakers or where what happened was a "highly predictable consequence" of the County's existing policy or the failure to train assistant prosecuting attorneys on the handling of remand orders.

IV.

Undoubtedly, the judicial system– to say nothing of the criminal defense system– has not functioned as it should when a criminal defendant remains imprisoned for seventeen years after his or her conviction has been reversed and no further action has been taken. Section 1983 liability, however, does not necessarily attach to any entity and/or individual as a result of this breakdown. It does not here. In short, Mladenoff was not personally involved in any conduct that led to any violation of Heyerman's speedy-trial rights to establish her individual liability. Heyerman fails to demonstrate

a defective policy or practice to hold Calhoun County or Mladenoff in her official capacity liable.

Accordingly, we affirm the district court's decision.

—————————————

**CONCURRENCE**

—————————————

SUTTON, Circuit Judge, concurring. I concur in Judge Duggan's opinion for the Court.

I write separately to add that, whatever else went wrong during Buxton Heyerman's unduly long incarceration, it was not a violation of the Speedy Trial Clause of the Sixth (and Fourteenth) Amendment. In view of Heyerman's seventeen-year stay in prison *after* the state courts reversed his conviction, it is clear that the Michigan criminal-justice system did not operate in a "speedy" manner. A speedy-trial violation, however, requires two things—state lethargy *and a state trial*. To the extent money damages under § 1983 are available at all for a speedy-trial violation, *see Quinn v. Roach*, 326 F. App'x 280, 290 (5th Cir. 2009), a claimant must show both elements. *See Doggett v. United States*, 505 U.S. 647, 651–52 (1992) ("to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial" has been excessive); *United States v. MacDonald*, 456 U.S. 1, 6 (1982) (speedy trial right "attaches only when a formal criminal charge is instituted and a criminal prosecution begins"); *Atkins v. Michigan*, 644 F.2d 543, 547 (6th Cir. 1981) (rejecting speedy-trial claim because the defendant "has not yet been tried"). Yet Heyerman established just one of the two requirements. Once the State figured out what had happened, it opted—wisely—not to prosecute Heyerman a second time.

It remains intriguing whether the facts of Heyerman's case might give rise to a § 1983 action premised on a different theory of liability, say an unreasonable detention under the Fourth Amendment or a violation of due process under the Fourteenth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Gerstein v. Pugh*, 420 U.S. 103, 125–26 & nn.26–27 (1975). But it is not intriguing whether a decision to release an individual before trial establishes a compensable violation of the Speedy Trial Clause. The Sixth Amendment guarantees speedy trials, not speedy detentions.

Nor, it bears adding, is the State the only one to blame for this remarkable saga. A jury convicted Heyerman in 1988, and the Michigan Court of Appeals reversed his conviction the following year. Oddly enough, his next eight years of unjustified incarceration were by design. As Heyerman acknowledged in his deposition, his attorney and he "developed a strategy of . . . sitting tight or staying put" in jail, without requesting a trial, for the first ten years of his confinement, because "there was a statute of limitations that [his attorney] thought would pass in 1997." R.39-4 at 77–78. The one thing Heyerman did *not* want after the state courts reversed his first-degree criminal-sexual-conduct conviction was a speedy trial because he thought his "chances of prevailing on a retrial were not real good," *id.* at 78, and he was not eager for the courts to impose another 20-to-40-year sentence. What he thus wanted, and what his silence was designed to create, was an unspeedy trial, one that would take ten years to initiate and one that would never happen because the limitations period had run. On this record, whatever else is wrong with the State's maintenance of its criminal-justice system or its enabling of this litigation strategy, a speedy-trial problem is not part of it.

Even when 1997 rolled around, and the time had come to cash in the chips on this strategy, Heyerman and his lawyer could not bring themselves to do it. Heyerman "asked [his attorney] why we aren't taking this back to court," and his attorney "started . . . hemming and hawing about the more time the better." *Id.* at 79. Heyerman eventually got fed up and stopped speaking with his attorney, who to his discredit apparently abandoned his client. Even then, Heyerman did not demand release or ask the courts for it.

Perhaps not surprisingly, this strategy, if one can call it that, did not work well for Heyerman. But it did not pan out well for his attorney either: a discipline board suspended him from the practice of law for 33 months and he eventually settled a malpractice claim filed by Heyerman for $95,000.

After his attorney transitioned from a do-nothing-with-the-State strategy to a do-nothing-with-the-client approach, neither Heyerman nor his family nor anyone else acting on his behalf showed diligence in bringing the situation to light. His complaint

says only that when appearing before Michigan parole officials during the fourteenth and fifteenth years of his post-reversal confinement—seven to eight years after his litigation strategy demanded action—he told them, "I don't know how much I can say, I am supposed to have a new trial." R.1 ¶¶ 27–28. While better than saying nothing, that is not a complaint that he was being detained without authorization. Not until Heyerman filed his petition in state court for a writ of habeas corpus did the State realize what had happened.

It is not often that an inmate seeks refuge from the prosecutorial arm of the State by laying low for seventeen years in prison in order to avoid the risk of a new trial that, if all goes badly, will lead to: incarceration. And it is not often that a State abets this strategy by failing to realize that it is housing an individual whose conviction has been reversed. One suspects that Heyerman and his attorney will not try this again, and one hopes that Michigan will not let this happen again. Either way, what has already happened did not violate the speedy-trial guarantee of the Sixth Amendment.