RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

FATHIREE UDDIN ALI,

>    *Plaintiff-Appellant*,

>    *v.*

> No. 24-1540

STEPHEN E. ADAMSON, Chaplain; DAVID M. LEACH,
Special Activities Coordinator; SHANE JACKSON,
Warden; MICHIGAN DEPARTMENT OF CORRECTIONS,

>    *Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cv-00071—Hala Y. Jarbou, District Judge.

Argued:  March 19, 2025

Decided and Filed:  March 28, 2025

Before:  SUTTON, Chief Judge; GRIFFIN and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  D Dangaran, RIGHTS BEHIND BARS, Washington, D.C., for Appellant.
Christopher Alex, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan,
for Appellees.  **ON BRIEF:**  Samuel Weiss, RIGHTS BEHIND BARS, Washington, D.C., for
Appellant.   Christopher Alex, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,
Lansing, Michigan, for Appellees.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge.  Fathiree Ali, a Muslim inmate, asked the Michigan Department
of Corrections to serve him only halal food, a special diet required by his religion.  After the

prison chaplain directed him to apply for the prison's vegan meal option, another official rejected his application upon learning that he had purchased over one hundred non-halal items from the prison commissary. The district court dismissed Ali's claim against the Department of Corrections and granted summary judgment to the officers. We dismiss Ali's appeal in part for lack of jurisdiction and affirm the rest of the district court's decision.

I.

Eating and fasting are central to many faith groups. Michigan prisons seek to accommodate a wide range of inmates whose beliefs require distinct diets. They offer three options: a regular menu, a vegetarian menu, and a vegan menu. The vegan menu complies with most kosher and halal dietary restrictions.

Not everyone is eligible for the vegan meal plan. To qualify, a prisoner must make a written request to the prison warden, who refers the request to the prison's special activities coordinator for approval. If the vegan meal "does not meet" an inmate's "religious dietary needs," the Department permits the inmate to request an alternative menu, subject to the "approval of the Deputy Director" of the Department of Corrections. R.33-3 at 7. The Department may rescind its approval if the inmate repeatedly eats food inconsistent with his professed faith.

Fathiree Ali is a Muslim inmate who used to be confined in Michigan's Carson City Correctional Facility. His faith contains two dietary restrictions. He must "consume a [halal] diet," which "must include meat," "dairy, chicken, eggs, honey, fish, cheese, lamb," and animal "fats." R.53-2 at 3. To "exclude any" is haram, "a major sin and act of disbelief." R.53-2 at 3. In addition, Ali must avoid certain foods, like pork, and meats slaughtered in a manner inconsistent with Islamic law.

Because the Carson City prison provided only haram meat entrées, Ali asked chaplain Steve Adamson for a "[halal] diet." R.53-2 at 3. Adamson indicated that he needed approval for a vegan diet first. He added that the Department "has not ever approved a meat diet for Muslim prisoners." R.53-2 at 5. Ali left the meeting with the impression that he needed approval for the vegan diet before he could request an alternative menu with halal meat.

Ali requested the vegan diet in 2017.  After an interview, Adamson recommended the prison approve his request because he found Ali "sincere in the practice of his faith."  R.33-7 at 2.  But David Leach, then the activities coordinator, did not.  He noticed that, even though the prison commissary offered two halal meat items, Ali had purchased three sausages and over a hundred meat-flavored ramen noodles—all haram—in the three months before his application.  Leach denied the request.

Ali sued Adamson, Leach, warden Shane Jackson, and the Michigan Department of Corrections under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Free Exercise Clause, and 42 U.S.C. § 1983.  The district court dismissed Ali's claims against the Department of Corrections and granted summary judgment in favor of the officials.

II.

Before reaching the merits of Ali's appeal, we must pause, indeed stop, to assure ourselves of jurisdiction over his claims.  Article III extends the "judicial Power" only to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  That "irreducible constitutional minimum" demands an injury in fact, traceable to the defendant's actions, and redressable by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Redressability, the relevant lens in this case, asks if it is "likely, as opposed to merely speculative," that a favorable decision would rectify Ali's injury.  *See id.* at 561 (quotation omitted).  Because these constitutional requirements persist from a lawsuit's cradle to its grave, we must dismiss an appeal as moot once the federal courts can no longer grant effectual relief.  *Brown v. Yost*, 122 F.4th 597, 601 (6th Cir. 2024) (en banc) (per curiam).

Ali's claims against the chaplain (Adamson) and the warden (Jackson) for injunctive relief will not redress his injury.  Only the special activities coordinator may approve requests for vegan meals.  And only a "Deputy Director" may approve requests for alternative menus, such as those containing halal meat.  R.33-3 at 7.  Adamson and Jackson have no power to do either.

Even if the chaplain and warden could help Ali by referring his application for the vegan meal plan to the special activities coordinator, Ali's claims are moot anyway.  Both of them worked at the Carson City Correctional Facility.  Ali now resides at the Thumb Correctional

Facility. He has not produced any evidence that the chaplain and warden at his old prison can obtain this requested meal plan at his new prison.

Ali's § 1983 claim against Leach for injunctive relief under the Free Exercise Clause suffers from a different mootness problem. Unlike Adamson and Jackson, Leach (the special activities coordinator) works for the Department of Corrections, not one prison. Ali may sue Leach only in his individual capacity because "officials acting in their official capacities are" not "persons" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). And Leach, the individual, has left the job. He no longer works for the Department. An injunction against him would "amount to no more than a declaration" of the law. *California v. Texas*, 593 U.S. 659, 673 (2021). This claim, too, is moot.

That leaves four sets of merits claims. We consider each in turn.

### III.

Does RLUIPA authorize a money-damages claim against Leach, Adamson, and Jackson? No. RLUIPA does not authorize damages against officials sued in their official capacity, *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), or their individual capacity, *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014).

Congress must speak unambiguously when it "legislates through the spending power." *Id.* That clear-statement requirement reflects the breadth of Congress's spending power. The federal government possesses "only the powers granted to it" as enumerated in the Constitution. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819). The States retain the remainder. But Congress may "regulate where it otherwise could not"—beyond its enumerated powers, in other words—by imposing conditions on federal funds afforded to state governments if "States consent to the bargain." *Haight*, 763 F.3d at 569. To make a fair offer and receive a knowing acceptance, Congress must set its conditions "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). A clear-statement imperative ensures that the States "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.*

That principle informs the scope of RLUIPA's conditions on state prisons receiving "Federal financial assistance." *See* 42 U.S.C. § 2000cc-1(b)(1). If a government imposes "a substantial burden" on "religious exercise" in such a prison, inmates may seek "appropriate relief" against the culpable entity or officer. *Id.* §§ 2000cc-1(a), 2000cc-2(a). Because "the word 'appropriate' is inherently context dependent," the term "'[a]ppropriate relief' is open-ended and ambiguous about what types of relief it includes." *Sossamon*, 563 U.S. at 286; *cf. Pennhurst*, 451 U.S. at 13, 22, 24–26 (holding that a spending condition giving developmentally disabled people "a right to appropriate treatment" was too "indeterminate" to compel states to fund treatment facilities). That open-textured term "plausibly covers just injunctive, declaratory, and other non-monetary relief" and does not unambiguously notify Michigan that taking federal funds would open its employees to private damages suits. *Haight*, 763 F.3d at 568.

Unable to dodge our on-point caselaw, Ali faces it head on. He suggests that the Supreme Court abrogated *Haight* and demands that we overrule it. The Court did not, and we may not.

In 2020, the Court held in *Tanzin v. Tanvir* that plaintiffs seeking "appropriate relief" under a different statute, the Religious Freedom Restoration Act (RFRA), may seek damages against *federal* officials sued in their individual capacity. 592 U.S. 43, 48–49 (2020). It observed, as the *Sossamon* Court did, that "appropriate relief" is "open-ended on its face," making its contours "inherently context dependent." *Id.* at 49 (quotation omitted). Noting that courts historically awarded damages at common law against officials in many settings, the Court concluded that RFRA's "appropriate relief" encompassed damages. *Id.* In doing so, it did not impose a clear-statement requirement.

Ali points out that RLUIPA also entitles a plaintiff to "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), suggesting that the two laws permit similar damages actions. But this argument asks too much of *Tanzin*. While Congress enacted RFRA under its Fourteenth Amendment enforcement power, *City of Boerne v. Flores*, 521 U.S. 507, 529–36 (1997), it enacted RLUIPA under its spending power, *Haight*, 763 F.3d at 559. "[T]he same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality op.). Just so here. While RLUIPA and RFRA share

similarly restrictive ends-means tests of state action, only the former—as a spending condition—must clearly state its terms and conditions. That indeed explains why the Court would invalidate RFRA as applied to the States when it turned on its enforcement power under the Fourteenth Amendment, *see City of Boerne*, 521 U.S. at 533–36, but has never invalidated RLUIPA as applied to the States. RFRA exceeded Congress's enforcement power under the Fourteenth Amendment. But the spending power allows Congress to exceed its enumerated powers, as it did in RLUIPA, by giving the States the choice to accept the regulation in return for federal money. So long as the congressional offer is clearly stated—including as to money damages—the States may permit this extra-constitutional regulation. Casually grafting *Tanzin*'s RFRA holding as to federal officials onto RLUIPA and its application to state officials would violate, not vindicate, the "inherently context dependent" nature of "appropriate relief." *Tanzin*, 592 U.S. at 49 (quotation omitted).

When two statutes have distinct constitutional sources, they may, sometimes they must, have distinct meanings. Take *District of Columbia v. Carter*, in which the Supreme Court held that the District of Columbia did not count as a "State or Territory" under 42 U.S.C. § 1983. 409 U.S. 418, 420–21 (1973). The plaintiff invoked precedent that the District of Columbia fell within "every State and Territory" as required by 42 U.S.C. § 1982. *Id.* But while Congress enacted § 1982 under its Thirteenth Amendment powers, the Court explained, it enacted § 1983 under its Fourteenth Amendment powers. *Id.* at 421–24. The former enabled Congress to enforce the abolition of slavery "within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII. But "the commands of the Fourteenth Amendment are addressed only to the State." *Carter*, 409 U.S. at 423. Therefore, the Court reasoned, the District of Columbia was not a "State" within the meaning of the Fourteenth Amendment, and the District's officers fell outside § 1983's scope, *id.* at 424–25—at least until Congress later amended § 1983, Act of Dec. 29, 1979, Pub. L. No. 96-170, 93 Stat. 1284.

This case is hewed from the same mold. Ali relies on precedent holding that "appropriate relief" under RFRA encompasses individual-capacity damages actions to insist that "appropriate relief" under RLUIPA does too. But after *City of Boerne*, RFRA does not apply to state officials. 521 U.S. at 532–36. By contrast, its constitutional application to "the internal operations of the

national government"—and to federal officials—"rests securely on" Congress's power to "determine how the national government will conduct its own affairs." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003). RLUIPA extends to state officials due only to Congress's spending power to "implement federal policy it could not impose directly under its enumerated powers" by offering the States money to comply with this extra-constitutional regulation. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012).

That makes all the difference. One source of congressional authority, the spending power, requires careful scrutiny and a clear statement to ensure that state officials made "a legitimate choice whether to accept" otherwise unconstitutional regulations "in exchange for federal funds." *Id.* The other source of congressional authority does not. When Congress simply limits the authority of federal prison officials to burden the free exercise of religion, it does not need a special source of power. *See O'Bryan*, 349 F.3d at 401; *City of Boerne*, 521 U.S. at 536. No clarity imperative thus applies. Neither Ali nor any court we know of has identified a "historically or constitutionally grounded norm[]" against individual-capacity damages lawsuits such that courts would require a clear statement from Congress to unsettle it. *Jones v. Hendrix*, 599 U.S. 465, 492 (2023). *Tanzin*, which involved an individual-capacity claim for money damages against federal prison officials under RFRA, required no such clear statement either. *See* 592 U.S. at 490–93. That silence is telling because the Supreme Court typically tells us when Congress must speak with unmistakable clarity. *See, e.g.*, *United States v. Miller*, No. 23-824, --- U.S. ---, 2025 WL 906502, at *8 (2025); *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro De Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023). Because RLUIPA's remedies demand clarity and RFRA's do not, "appropriate relief" warrants a narrower definition under RLUIPA.

This conclusion also respects *Tanzin*. Recall that it reasoned that the ordinary meaning of "appropriate relief" required "inherently context dependent" determinations of what remedies were "specially fitted or suitable." *Tanzin*, 592 U.S. at 48–49 (quotation omitted). In "light of RFRA's origins," the Court found "damages under § 1983" "particularly salient" in circumscribing "appropriate relief." *Id.* at 50. But in light of RLUIPA's origins under the spending power, a different set of expectations and requirements applies. In the same way that

asking your own child to do the dishes sheds little light on the propriety of asking other children to do your dishes, Congress's inherent prerogative to regulate federal officials does not mean it may regulate state officials.

Our sister circuits agree—both before and after *Tanzin*. Since *Tanzin*, the Second, Fifth, and Ninth Circuits reaffirmed that RLUIPA does not permit individual-capacity damages suits against state officials. *See, e.g.*, *Landor v. La. Dep't of Corr. & Pub. Safety*, 82 F.4th 337, 341–44 (5th Cir. 2023), *petition for cert. filed*, No. 23-1197 (May 3, 2024); *Tripathy v. McKoy*, 103 F.4th 106, 114 (2d Cir. 2024), *petition for cert. filed*, No. 24-229 (Aug. 27, 2024); *Fuqua v. Raak*, 120 F.4th 1346, 1359–60 (9th Cir. 2024). They reasoned, as we do, that RLUIPA's spending power underpinnings convey a narrower scope to "appropriate relief" that excludes damages, given Congress's failure to say otherwise unambiguously. *Landor*, 82 F.4th at 341; *Tripathy*, 103 F.4th at 114; *Fuqua*, 120 F.4th at 1360. Before *Tanzin*, the Third Circuit, like our circuit in *Haight,* distinguished RLUIPA's spending-power roots from RFRA's Fourteenth-Amendment ones. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 303–04 (3d Cir. 2016).

The Court's spending-power conditions, contrary to Ali's argument, demand clarity regardless of whether state or individual pocketbooks are on the line. They apply when the federal government conditions highway funds on adopting national minimum-drinking ages, *South Dakota v. Dole*, 483 U.S. 203, 205–07 (1987), or conditions child-education funds on accepting fee-shifting in later Individuals with Disabilities Education Act suits by families against state school districts, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006).

Ali points out that RLUIPA permits the federal government to seek only "injunctive or declaratory relief" when it sues a State, 42 U.S.C. § 2000cc-2(f), but used the broader term "appropriate relief" for individual-capacity lawsuits against government officials, *id.* § 2000cc-2(a). That shows, he claims, that Congress knew how to narrow the range of such lawsuits and chose not to do so here. But that inference is just that, a mere inference. It does not signal "clearly," "expressly," "unequivocally," and "unambiguously" that Congress imposed money-damages remedies in using the term "appropriate relief." *Sossamon*, 563 U.S. at 285, 290; *see Haight*, 763 F.3d at 568.

IV.

Does Ali have a cognizable claim for injunctive or declaratory relief against just Leach under RLUIPA?  (Recall, by the way, that Adamson and Jackson no longer have power to adjust Ali's meal plan because he has moved to a different prison.)  No as well.

RLUIPA bars States from imposing a "substantial burden on the religious exercise of a person residing in or confined to an institution" unless it is the "least restrictive means" of furthering a "compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  To obtain relief, an inmate must show that he has a "sincerely held religious belief" and that the government "substantially burdened [his] exercise of religion."  *Holt v. Hobbs*, 574 U.S. 352, 361 (2015).  Only then may the prisoner insist that the State satisfy a "daunting compelling-interest and least-restrictive-means test."  *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019).  A substantial burden exists if the government "effectively forc[es prisoners] to choose between engaging in conduct that violates sincerely held religious beliefs and facing a serious consequence."  *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 589 (6th Cir. 2018).

Ali seems to seek relief from two features of Michigan prisons.  He believes that they serve non-haram food cross-contaminated by haram meat.  And he requests that the prison affirmatively serve him halal meat.

As to the first complaint, Ali can already obtain relief by signing up for the vegan meal plan.  The vegan meals comply with "[h]alal religious tenets" and thus provide adequate nutrition without cross-contamination from haram meat.  R.33-3 at 7.  Better still, Ali can re-apply for the vegan diet today.  Under Department policy, a prisoner "whose request" for a vegan meal "is denied" may apply again the next year.  R.33-3 at 7.  Because the record suggests that the prison last denied Ali's meal request in 2017, he could have re-applied any time after 2018.  And his new request would go to a new special activities coordinator with a more recent record of his commissary purchases.  Even if those purchases contained haram items, his new application could explain why.  That Ali has not re-applied for a vegan meal in seven years— despite this ready alternative to eating cross-contaminated food—undermines his request for relief from this court.

The second complaint fares no better because Ali has two alternatives to access halal meat. *First*, he may apply today for an alternative meal plan if the vegan menu is inadequate. The Department's policy accommodates him, as it provides that a prisoner who finds the vegan menu inadequate to meet his dietary needs may request an alternative menu. *Second*, Ali may supplement his diet by purchasing halal sausages from the prison commissary, as he routinely did in 2017. Keep in mind, moreover, that Ali's claim is against Leach. The special activities coordinator's *denial* of the vegan diet eight years ago has no effect on Ali's affirmative need to consume halal meat. In this case, as with the others, appropriate relief comes from Michigan prisons and not federal courts.

Ali maintains that Leach's rejection of his request, combined with Adamson's statement of prison policy, made it impossible for him to consume a diet without haram foods and with halal meat. That's not true. Ali could make a new request for a vegan meal—now with a new chaplain, in a new prison, with a new special activities coordinator.

Ali also contends that his prison salary does not cover the halal meats in the commissary. But the undisputed record says that he can afford them. Ali spent roughly ninety dollars each month on various food items in the commissary. The presence of alternative sources of halal meats undercuts his charge of coercive pressure by Michigan prisons.

All of this helps to explain why *Haight v. Thompson* does not help him. 763 F.3d 554 (6th Cir. 2014). It held that "barring access" to certain foods constituted a substantial burden for inmates celebrating an annual powwow as part of the Native American Church. *Id.* at 564–65. No such bar exists here because Ali may re-apply today for a vegan menu or supplement his diet today with food from the commissary.

V.

Has Ali pleaded a cognizable RLUIPA claim against the Michigan Department of Corrections? No. While Ali may sue the Department under RLUIPA for declaratory and injunctive relief, *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326–27 (5th Cir. 2009), *aff'd*, 563 U.S. 277 (2011); *Haight*, 763 F.3d at 568, his complaint fails to state a claim for relief against the agency because he does not identify a policy that violates RLUIPA.

Ali must show that a "governmental entity," 42 U.S.C. § 2000cc-5(4)(A)(i), imposed "a substantial burden on" his religious exercise, *id.* § 2000cc-1(a). But he has not identified any Department policy that does so. In truth, the Department's policies accommodate him. They permit prisoners to request a vegan menu that complies with "[h]alal religious tenets" and so does not contain haram meat or cross-contaminated food. R.33-3 at 7. If a prison does not offer vegan meals, they permit prisoners with religious dietary restrictions to transfer to one that does. And they allow prisoners to propose an alternative menu for the Deputy Director's approval if the vegan menu "does not meet his/her religious dietary needs." R.33-3 at 7.

Ali's only theory of harm attacks the "refusal to approve" his "request for a [halal] diet." R.1 at 6. But the Department of Corrections did not refuse that request. Leach did. Because Ali does not challenge the Department's policies themselves, he fails to show that it imposed a "substantial burden" on his religious exercise.

VI.

Does Ali have a cognizable money-damages claim against Adamson and Leach under the Free Exercise Clause and § 1983? No.

Qualified immunity protects officials from damages liability if their conduct "does not violate clearly established . . . constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). That command contains two conjunctive requirements: (1) that the officers violated a constitutional right, and (2) that the right was clearly established. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). At a minimum, Ali's claims fail the second requirement.

*Adamson.* At issue is whether Adamson violated clearly established free-exercise law by telling Ali he needed to request the vegan menu before requesting an alternative menu. A sentence in prison, it is true, does not eliminate an individual's constitutional protections. *Turner v. Safley*, 482 U.S. 78, 84 (1987). But the "complex and intractable problems of prison administration" require due consideration in applying constitutional guarantees. *Shaw v. Murphy*, 532 U.S. 223, 231 (2001) (quotation omitted). Only when a policy "singles out and substantially burdens a prisoner's sincere beliefs" do we ask if it serves a legitimate "penological interest." *Cavin*, 927 F.3d at 460. While prisoners have a right to "an adequate diet" consistent

with their religious beliefs, *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010) (quotation omitted), an "isolated, intermittent, or otherwise de minimis" disruption of that diet does not substantially burden that right, *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1054 (8th Cir. 2020).

Adamson did not violate Ali's clearly established free-exercise rights. He used his power at the outset to help, not hinder, Ali by recommending him for vegan meals and by reporting that Ali was "sincere in the practice of his faith." R.33-7 at 2. In doing so, he noted that Ali consistently "practic[ed] his faith" and "[a]ttend[ed] all" available services. R.33-7 at 2.

Ali also has not produced evidence that Adamson's targeted action—requesting that Ali receive approval for a vegan meal before seeking an alternative meal—"single[d] out and substantially burden[ed]" his request to eat halal meat. *Cavin*, 927 F.3d at 460. This procedural requirement at worst made Ali fill out two forms to request an alternative diet, not one. And both requests made Ali confirm the same things: that a different menu was "necessary to the practice of [his] designated religion," R.33-3 at 7, and that his beliefs required him to avoid haram meat and consume halal meat. Neither request forced Ali to choose between his faith and his food.

Ali insists that Adamson's recommendation, when combined with Leach's denial, deprived him of halal-compliant meals. But that argument would make Adamson liable for Leach's conduct. Section 1983 liability turns "only on" each officer's "own unconstitutional behavior." *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). Adamson's burden required only that Ali receive approval for a vegan meal first. If Leach wrongfully denied that request, it was he who violated Ali's First Amendment right unless Adamson "implicitly authorized, approved, or knowingly acquiesced" in Leach's denial. *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982). Adamson did not. He recommended Ali for the vegan meal plan. Ali did not offer any evidence that the Deputy Director would have approved his request for a custom diet had he asked. All in all, Adamson did not deprive Ali of the chance to eat meals consistent with his faith.

*Leach*. Leach also did not violate clearly established First Amendment principles by denying Ali's request for a vegan meal. Because *Turner*'s flexible test established the law for

only obvious violations, we look for similarity "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Ali must identify published "on-point caselaw" at the time of Leach's 2017 denial with "facts similar enough that it squarely governs this one." *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quotation omitted).

But Ali does not present any on-point precedent. Our cases hold that prison officials must "provide an adequate diet" consistent with an inmate's "religious dietary restrictions." *Colvin*, 605 F.3d at 290 (quotation omitted). Even in the more demanding context of RLUIPA, zero-tolerance policies rescinding an inmate's religious meal for "mere possession" of one non-compliant snack just "*may* be overly restrictive." *Id.* at 296 (emphasis added). That statement about a statute does not put every administrator on notice of free-exercise constitutional requirements. In this context, our cases routinely permit officials to withdraw prisoners from religious meal plans if they find that a prisoner possessed or consumed food violating their stated religious precepts. *E.g.*, *Berryman v. Granholm*, 343 F. App'x 1, 6 (6th Cir. 2009); *Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir. 2003) (order). That explains why an official may revoke an inmate's pork-free dietary accommodation if he repeatedly purchases pork products from the commissary. *Miles v. Mich. Dep't of Corr.*, No. 19-2218, 2020 WL 6121438, at *3 (6th Cir. Aug. 20, 2020) (order).

Ali suggests that *Berryman* and *Russell* do not apply because they involved revocations of religious-meal privileges already granted, not denials of religious-meal applications. In Michigan, he adds, prisoners receive a hearing and a second chance if officials catch them violating their professed dietary restrictions. But a prison administrator still may reasonably conclude that an applicant with myriad haram purchases does not have an authentic commitment to a halal diet without violating clearly established free-exercise law.

Ali insists that Leach denied his request for unreasonable reasons—and clearly violated *Turner* in doing so—because other individuals attested that they had received approval for a vegan diet despite having purchased non-halal foods. But no evidence shows that these inmates purchased as many haram items as Ali did.

The one case Ali presents—an unpublished order from 2021—does not help. *See Ewing v. Finco*, No. 20-1012, slip op. at 5–6 (6th Cir. Jan. 5, 2021) (order). In addition to being non-precedential, *Ewing* did not specify how many non-halal purchases those prisoners made—and thus could not show whether those inmates' actions fairly compare to Ali's purchases of over a hundred such meals in three months.

We dismiss this appeal in part and affirm in part.