NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0498n.06

Case No. 24-2029

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

PAUL BLANTON,

    Plaintiff-Appellant,

v.

MATTHEW HISTED, ANTHONY GOETZ,
JENNIFER LESTER, CRESENCIO PERRIN,
PAULA SEYMOUR, CHERI YAGER, and
UNKNOWN PARTY #1,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Oct 24, 2025
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF
MICHIGAN

OPINION

Before: SUTTON, Chief Judge; GIBBONS and CLAY, Circuit Judges.

SUTTON, Chief Judge. Paul Blanton, an inmate in a Michigan prison, sued prison officials (1) for retaliating against him when he complained that they failed to satisfy his requests for a kosher diet and (2) for failing to accommodate all of the requirements of his kosher diet at each meal. The district court granted summary judgment to the prison officials. We affirm.

I.

The Alger Correctional Facility in Michigan's Upper Peninsula maintains a "religious kitchen." R.58-5 at 3. The meals prepared in this kitchen accommodate the diets of religiously observant inmates. A Jewish rabbi has certified the kitchen as kosher, and he frequently inspects it to ensure its kosher status.

Paul Blanton, who is Jewish and maintains a kosher diet, was an inmate at the Alger facility. According to Blanton, prison officials at Alger cross-contaminated his food and deprived him of "'Passover' meal minimum requirements." R.46 at 7. He has submitted over fifty grievances to prison officials about these issues over the years. At least one official told Blanton that she would train the cooks in the religious kitchen, usually other inmates, about the proper procedures for preparing kosher meals. The warden also told him that he must bring the issue to the attention of an "officer or food service employee" upon receiving his food tray. R.58-9 at 4.

To contest food quality, including its kosher status, prison officials require inmates to open their food boxes while in the presence of a food-service employee or custody staff. Blanton insisted, however, on complaining about his meals after he had opened the meal outside their presence and after they could verify his complaint. To use one prominent example, he frequently raised concerns that the placement of the plastic covering over the meal failed to prevent cross-contamination from non-kosher foods, but he declined to identify the problem before he opened the container. Prison officials repeatedly reminded him that he must open his food tray in their presence. For reasons that remain unclear, Blanton instead held his trays up to video cameras in the cafeteria to verify their contents. That did not suffice to correct the problem before he ate his meal, as prison staff informed him, because security staff, not food-service staff, monitor the cameras.

Blanton alleges that one food steward, Jennifer Lester, grew angry at his repeated complaints about how the prison served his food, and that she threatened to write a misconduct report "if he brought his tray to her one more time" after he had opened them. R.46 at 20. Lester says she did so "as a warning" that "his acts of non-compliance"—bringing his tray to her after he opened it outside her presence—"would result in a misconduct report." R.58-6 at 4.

2

Blanton also alleges that the prison's religious kitchen disregarded kosher cooking requirements. According to what one former cook, an inmate, told Blanton, workers in the kitchen would "retrieve non-kosher items" and "bring them into the kosher room to be openly handled and served under the guise of being kosher." R.62-2 at 2. Another former cook, also an inmate, told Blanton that prison food-service officials Paula Seymour, Cresencio Perrin, Lester, and Anthony Goetz would "kick [non-kosher cooks] out of the kosher room" "when [they] were in there cooking non-kosher food" but "took no steps to have the room properly cleaned and re-kosherized" after they prepared the non-kosher food. R.62-3 at 2. Both of these cooks told Blanton that food workers did not receive training on kosher requirements. In the course of these disputes, Blanton asked to be transferred to Ionia Correctional Facility.

In 2022, Blanton sued several officials from the Michigan Department of Corrections in their individual capacities—food stewards Goetz, Lester, Perrin, and Seymour as well as food-service directors Matthew Histed and Cheri Yager—under the Religious Land Use and Institutionalized Persons Act, often called RLUIPA, as well as the First and Fourteenth Amendments. He sought declaratory relief and monetary damages. After discovery, the prison officials moved for summary judgment. The district court granted the motion, concluding that the free-speech retaliation claim lacked merit and that the prison officials were entitled to qualified immunity on the free-exercise claim because the right in question was not clearly established.

This appeal followed. Blanton's requests for injunctive relief have become moot because the State transferred him to another prison: Thumb Correctional Facility. That leaves his request for monetary relief under the federal free-speech and free-exercise clauses.

II.

We give fresh review to the district court's grant of summary judgment on these two claims and construe the facts in the light most favorable to the non-movant, Blanton. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017).

*Free-speech retaliation.* We start with Blanton's challenge to the district court's dismissal of his retaliation claim against Lester. The gist of this claim is that Lester, a food steward, threatened to issue a misconduct report against Blanton if he continued to complain about his food without giving the staff a chance to inspect it before he removed the plastic covering from the food tray. To succeed on a First Amendment retaliation claim, Blanton must show that he engaged in protected conduct, that he suffered adverse action, and that his protected conduct motivated the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

Blanton's claim has at least two flaws. The first problem is that he has not satisfied the protected-conduct imperative. An inmate, it may be true, "has a First Amendment right to file grievances against prison officials." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *accord Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). And an inmate, it may also be true, has a free-speech right to raise complaints about food service workers. *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018). But the First Amendment does not protect complaints if they "violate[] legitimate prison regulations or penological objectives." *Smith*, 250 F.3d at 1037.

Blanton's complaints do not qualify as protected conduct because he refused to comply with prison officials' repeated, and eminently sensible, requests for how to make these complaints. Over and over, prison officials told him that he must open his trays in front of food stewards to register an actionable complaint about cross-contamination of his kosher food. Blanton himself acknowledges his habit of showing food to a video camera rather than an officer. He acknowledges

that he opened his tray out of the presence of food stewards notwithstanding repeated reminders not to do so. And affidavits from other defendants confirm that he repeated this pattern of complaining about food after walking away with a tray or after many days had passed.

The second defect with this cause of action, related to the first one, is that he has not shown that his conduct was a "substantial or motivating factor" in Lester's decision to warn him not to register food complaints in this manner. *Clark v. Stone*, 998 F.3d 287, 303 (6th Cir. 2021) (quotation omitted). A motivating factor is "essentially [a] but-for cause." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007). Blanton simply has not shown that protected speech, as opposed to his failure to adhere to reasonable prison policies, motivated Lester's warning that she would file a misconduct report if his conduct continued. He has not offered evidence that his complaints to Lester complied with prison policies either before or after she gave him these fair-minded instructions, all designed by the way to fix any problem with contaminated food. All in all, Blanton has not shown that protected conduct caused the warning.

In trying to avoid this conclusion, Blanton maintains that the district court relied on inadmissible hearsay when it relied on defendant Histed's affidavit. But Histed himself responded to many of Blanton's grievances, some of which conceded Blanton's non-compliant behavior. Histed's testimony thus turns on first-hand personal experience, not out-of-court statements by others made for "the truth of the matter asserted." Fed. R. Evid. 801(c). We would reach the same conclusion, at any rate, with or without Histed's affidavit.

Blanton adds that triable issues of fact remain and that the district court failed to construe factual inferences in his favor. Not so. In response to Lester's evidence-supported argument, Blanton has not come forward with any evidence that counters these material facts. That reality

5

requires us to affirm the district court's entry of summary judgment for Lester on the retaliation claim.

*Free exercise*. Blanton next challenges the district court's resolution of his free-exercise claim and its conclusion that qualified immunity applies to the defendants. The defense of qualified immunity has two familiar components. The claimant must show that the officers violated his constitutional right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). And he must show that right was clearly established at the time of the relevant incidents. *Id.* In addressing the clearly established requirement, courts must be careful not to climb too high up the ladder of generality and ignore the "particularized" showing required in a given case. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Otherwise, the second inquiry would differ little from the first one. The key question with respect to the second prong is whether the claimant can "identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *White*, 580 U.S. at 79). That ensures that only "the plainly incompetent or those who knowingly violate the law" become liable for money damages. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The parties share some common ground in applying these principles. They agree that incarceration does not eliminate an inmate's free-exercise rights. Appellant's Br. 9–10; Appellee's Br. 38. They agree that, while the realities of prison life place some limits on when and how an inmate receives a religious diet, a correctional facility must reasonably accommodate faith-driven diet requests. Appellant's Br. 9–10; Appellee's Br. 29. They agree that prison officials "must provide an adequate diet without violating the inmate's religious dietary restrictions." *Colvin v.*

6

*Caruso*, 605 F.3d 282, 290 (6th Cir. 2010) (quotation omitted). And they agree that an adequate diet must be "sufficient to sustain the prisoner in good health[.]" *Id*. (quotation omitted).

No one disagrees, moreover, that the Alger prison took steps to comply with these rights. The facility provides kosher meals. It has a kosher kitchen. And it employs a rabbi to ensure that the preparation and content of the kosher meals comply with the requisite standards.

What separates the parties is the reality that the Alger prison apparently did not always satisfy these requirements. Rather than target a prison policy of denying kosher food to Jewish inmates, Blanton argues that the prison staff sometimes failed to avoid cross-contamination or follow other kosher requirements. According to his evidence-supported contentions, for example, the Alger facilities failed at various times over the years to serve food in a way that avoided cross-contamination with non-kosher food, failed to ensure non-kosher food and unclean kitchen instruments did not touch kosher food, and failed to have all Passover food items on the Holy Day.

But mistakes in preparing a religious diet do not amount to violations of clearly established rights. None of the mistakes precluded him from receiving an adequate diet. Blanton does not claim, for example, that he was malnourished or deprived of essential nutrients due to the prison officials' actions. Plus, Blanton did not help matters when he repeatedly refused to target these problems at a time prison staff could fix them. Qualified immunity is meant to protect all but those who "*knowingly* violate the law" and "gives ample room for mistaken judgments." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (emphasis added) (quotation omitted). In the last analysis, Blanton simply does not "identify published on-point caselaw at the time" of the prison officials' actions "with facts similar enough that it squarely governs this one." *Ali v. Adamson*, 132 F.4th 924, 936 (6th Cir. 2025) (quotation omitted).

7

Blanton's counterarguments do not alter this conclusion. He points to *Ackerman v. Washington*, 16 F.4th 170 (6th Cir. 2021). But that case held that a policy of not providing dairy and meat on holy days substantially burdened Jewish inmates' religious exercise under RLUIPA. *Id.* at 191. A RLUIPA case cannot clearly establish what the Free Exercise Clause requires. *See Ali*, 132 F.4th at 936 (noting RLUIPA's "more demanding context"). What is more, Blanton does not provide any evidence to show anything more than mistakes or misunderstandings about the menu on holy days.

Otherwise, Blanton mainly invokes unpublished, district court, or out-of-circuit cases for support on this issue. *See Bey v. Tenn. Dep't of Correction*, 2018 WL 1542383 (E.D. Tenn. Mar. 29, 2018); *Hermansen v. Thompson*, 678 F. App'x 321 (6th Cir. 2017); *Alexander v. Carrick*, 31 F. App'x 176 (6th Cir. 2002); *McManus v. Bass*, 2006 WL 753017 (E.D. Va. Mar. 22, 2006). That does not help him here when it comes to meeting the clearly established imperative. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (quotation omitted). An unpublished case cannot do so as it "doesn't even bind a future panel." *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022). No authoritative case law shows that these occasional errors and mistakes by the Alger prison clearly violated Blanton's free-exercise rights.

We affirm.